## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### Norfolk & Western R. R. Co. v. Emmert.

#### June 30th, 1887.

RAILROADS—*Employees—Negligent injuries—Contributory negligence.*—
Where the cars are of unequal height, crooked links are necessarily
used to couple them. Employee, whose duty it was to couple them,
had opportunity to know, and did know, these facts. Yet he went in
between the car that was approaching by his own signal, and the sta-
tionary car, and used a straight link to make the coupling, thereby
allowing the bumper of the former to pass under the bumper of the
latter, by which means he was caught between them and injured.
HELD.:
     Employer is not liable.

Error to judgment of circuit court of Washington county
rendered February 22d, 1887, in the action of trespass on
the case wherein David S. Emmert is plaintiff, and the
Norfolk & Western Railroad Company is defendant. The
jury found for the plaintiff and assessed his damages at
$950. The defendant asked that the verdict be set aside
as contrary to the law and the evidence. The court over-
ruled the motion, and the defendant excepted, and the
evidence was certified. The court entered judgment accord-
ing to the verdict; to which the defendant obtained a writ
of error and *supersedeas.* Opinion states the case.

*Fulkerson & Page,* for the plaintiff in error.

*Daniel Trigg, D. F. Bailey,* and *H. W. Flournoy,* for
the defendant in error.

Fauntleroy, J., delivered the opinion of the court.

The plaintiff, Emmert, in the fall of the year 1881, was switchman and car-coupler in the employ of the Norfolk & Western Railroad Company at their yard at Bristol. As such, it was his duty to shift the cars and trains upon said yard and make up trains to leave the station. The shifting was done by a yard engine and an engineer under the direction and control of the switchman and coupler while engaged in the operation of shifting. On the occasion of the alleged injury complained of, in November, 1881, two freight trains came into the yard, from the east, very close together. The first train stopped on the main track, and the locomotive, which had brought it in, was detached from it, and the yard engine was coupled to the rear end of the train, by the said switchman and coupler, and drew it backwards to a switch and pushed it upon a side track; the caboose, which was the rear car of the train, was un-shackled or uncoupled from the car immediately in front of it, and the yard engine stood there holding the caboose until the second train came in. The second train stopped upon the main track, and the plaintiff brought the yard engine, with the caboose attached, out upon the main track, and coupled the two cabooses together, and then uncoupled the caboose of the second train from the car in front of it, and caused the yard engine to draw the two cabooses back for the purpose of putting them upon a track called the coal-pen track, where the cabooses were usually placed, and upon which a caboose was then standing. After changing the switch leading into the coal-pen track, plaintiff went forward, in advance of the moving cabooses, for the purpose of coupling them to the standing caboose—it being the custom to so couple the cabooses for the purpose of bringing them out, when needed, to be attached to trains. The plaintiff took his position by the bumper or draw-

head of the standing caboose, having given to the engineer of the yard engine the proper signals, which were strictly obeyed, and when he attempted to make the coupling, the draw-heads or bumpers passed each other, the draw-head of the moving caboose passing under that of the standing caboose, and the plaintiff was caught between the cabooses. He extricated himself, and, with assistance, he got upon the engine, where he remained one or two hours, and then went to his home, close by, where he was confined to his house some three or four weeks; and then went back into the employ of the plaintiff in error; first in the depot, then on the transfer platform, and afterwards as a watchman at Main-street crossing; and, while so last employed, as watchman, he alleges that he caught cold in his injured hips and was laid up twelve months. It does not appear that the plaintiff ever claimed that he was injured on account of any defect in the cars, or by the fault or neglect of the railroad company, or its agents or servants, until about a year after the accident, when he brought this suit.

At the sixth trial of the case instructions were asked for and refused, and instructions were given by the court, of its own, to which exceptions were taken, and the jury rendered a verdict in favor of the plaintiff for the sum of $950. A motion was made to set the verdict aside and grant a new trial, upon the ground that the verdict was contrary to the law and the evidence; which motion the court overruled, and entered judgment upon the verdict for the plaintiff.

The declaration as amended was demurred to, and the court overruled the demurrer; which action of the court, as well as the refusing and giving instructions as aforesaid, were excepted to, and are assigned as error by the plaintiff in error. But, in the view which we take of the case as presented in the bill of exceptions, it will not be necessary to consider any of the errors assigned, except the alleged

error of the court's refusal to set the verdict aside and to grant a new trial.

The evidence of the plaintiff in the court below (who is the defendant in error here), as set forth in the bill of exceptions, reveals a plain case of contributory negligence, and shows clearly that but for the concurring fault—recklessness and want of ordinary care by the defendant in error—the accident would not have occurred, and that his injury was caused by his own gross negligence, for which the law will not allow him a premium by holding his employer to a liability in damages.

The testimony of the defendant in error, out of his own mouth, is that his duties as car-coupler and switchman were to move cars and trains, and make up trains on the yard; to shift cars to different points, and put them in their proper place in trains; that he was furnished with a list; that the company had car-inspectors and overhaulers on the yard, whose duty it was to look around the cars and see if anything was wrong about them as soon as the train came in; that the overhaulers and inspectors would be ready when the train came in, and would commence at one end and go along the train, tap the wheels, tighten the bolts, &c.; that they were always there, waiting when the trains came; that it was the duty of the inspectors to inspect all the cars and cabooses; that it was his duty not to shift the cars until the inspectors and overhaulers had gone over them and informed him that they were all right; that it was his duty to have known whether the caboose which he alleges to have been out of repair had been inspected or not before he shifted it; that he could not say whether it had been inspected or not; that the inspectors were there at work upon that train that day; that he shifted the caboose in question just a little while after the train came in; that he uncoupled the bumpers of the caboose from the train, and it was coupled with a straight link; that he

didn't look at it, but stepped in and pulled out the pin and laid it on the sill of the car in front, and stepped out and waived the engineer (of the shifting engine) back; that the engineer was an experienced engineer, and that when he motioned or signalled to him to come back, or go forward, or stop, he did exactly as he motioned; that he was taking the caboose in on the coal-pen track when he was hurt; that there was one caboose (an old A. M. & O. caboose) standing on the coal-pen track; that he was walking in front of the two moving cabooses—rather on one side, where the engineer could see him; that when he got in a car-length of the stationary caboose, he gave the engineer the sign of one car-length, by holding up one finger, and stepped in between the cabooses and set the pin in the bumper of the caboose that was standing still, and turned around to take hold of the link of the car or caboose that was coming up; that as he went to put the link in the other bumper he discovered that the bumpers were going to slip past each other; that he saw it was loose and would slip by; that he had to jerk his hand out of the way to keep it from being mashed; and the bumper of the moving caboose passed under the bumper of the stationary caboose and caught him between the two cabooses; that he had uncoupled this caboose from the last train that had come in; that it had the same link in it when he uncou pled it from the train that he attempted to couple it to the stationary caboose with; that he left the link in that bumper of that caboose when he uncoupled it from the train; that he had been in the employ of the company six or eight months, and that directly after he went into the employ of the company he discovered that cars and bumpers were of different heights; that, to enable him to do his work as switcher and coupler, the company furnished yard engine, engineer, fireman, switch-bars, links and pins; that they furnished overhaulers to inspect cars; that the com-

pany furnished straight links and crooked links to couple cars; that when cars were of equal height and same pattern straight links were used, and when cars were of unequal height they used crooked links; that the engineer obeyed his signals; that crooked links are necessary, because cars came there of different height, and standard cars are higher than A. M. & O. cars, and it is necessary to use crooked links; that common sense taught him that; and he told by looking whether one was higher; I was employed for that business; it was my business to know when to use crooked links and when not; that the crooked links were there; that if he needed a crooked link it was his duty to get it and use it; but that he didn't use a crooked link because he didn't need it; that he could have coupled it with a straight link if it hadn't been out of repair; that when he uncoupled the caboose from the train he didn't look to see whether the bumper came down—it did not fall down; that he saw when he went to make the coupling that the bumper was not in its right place, and tried to raise it; that it was loose in the collar; that all bumpers are loose in the collar, but this was about two inches looser than usual; that the wood had worn away, and this gave it play.

The declaration charges upon plaintiff in error knowledge of the want of repair; but there is no proof of notice to, or knowledge by, plaintiff in error of the condition of the bumper on the caboose; and it was the special duty of the defendant in error to have noticed the condition of the bumper when he uncoupled it from the train, and to have reported it, if, in fact, it was out of order; and not to at-attempt to couple cabooses of different heights with a straight link. It was his duty to observe the cars and their couplings, so as to determine, before attempting to couple them, what kind of a link should be used. The evidence clearly shows that the coupling should have been

made with a crooked link; and the failure to observe the disparity in the heights of the draw-heads, or the miscalculation of the defendant in error as to the necessity for the use of a crooked link to effect the coupling with, in safety, and his failure to use a crooked link for the operation, was negligence on the part of the defendant in error, but for which the accident would not have occurred. The law does not offer a bonus to employees for recklessness or carelessness in the discharge of their duties by imposing liability upon employers for injuries which are the result of their own concurring and co-operative fault or negligence. This case is controlled by the recent and oft-repeated decisions of this court. *Clark's Adm'r* v. *R. & D. R. R. Co.,* 78 Va. (3 Hans.); *N. &. W. R. R. Co.* v. *Ferguson,* 79 Va. (4 Hans.); *Rudd's Adm'r* v. *R. & D. R. R. Co.,* 80 Va. (5 Hans.); *Darracott* v. *C. & O. R. R. Co.,* 83 Va.; *N. & W. R. R. Co.* v. *Cottrell,* 83 Va.

The trial judge who heard and considered the evidence given by the witnesses, upon *six* trials of this case, filed his opinion as part of the record. And, curiously enough, he refused to set aside the verdict and grant a new trial, although he said: "The plaintiff in this case (defendant in error), if guilty of negligence, was not intentially so; it was such negligence as very often happens to men too lethargic or incautious, and owing to their peculiar mental habit, must be regarded as more their misfortune than their wilful fault. The plaintiff could not be supposed, in this case, to have wilfully courted the injury, but he thoughtlessly ran upon it; and this, in strict law, was a violation of his contract with his employer, and of his duty. In view of this evidence, the jury may have thought that both plaintiff and defendant were negligent, and that, as applied to this case, the defense of contributory negligence was a hard defense, and as there was mutual fault, the plaintiff should not be compelled to bear all the loss."

Opinion.

We are of opinion that the circuit court erred in refusing to set aside the verdict of the jury and to grant a new trial and that the judgment complained of must be reversed and annulled, and the cause be remanded to the circuit court of Washington county with directions to set the verdict aside and award a new trial.

JUDGMENT REVERSED.